UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

BENITO A. SANTIAGO,

              Plaintiff,

v.                                  Case No. 3:22-cv-484-MMH-MCR

SERGEANT JACKSON, et al.,

              Defendants.

_____

## **ORDER**

### **I. Status**

Plaintiff Benito Santiago, an inmate in the custody of the Florida Department of Corrections (FDC), initiated this action on April 27, 2022, by mailing a pro se Complaint for Violation of Civil Rights (Doc. 1) under 42 U.S.C. § 1983. See Houston v. Lack, 487 U.S. 266, 276 (mailbox rule). He is proceeding on an Amended Complaint (Amended Complaint; Doc. 13) against four Defendants: Sergeant Jackson; Lieutenant Burns; Lieutenant Levai; and Officer Dean.[1] Before the Court is Defendants' Motion for Summary Judgment (Motion; Doc. 52), with exhibits.

---

[1] Santiago sued five Defendants, but he voluntarily dismissed his claims against the fifth one, Defendant Fisher, after Fisher's death, because he was unable to identify a "proper party" for substitution. See Order (Doc. 95).

The Court advised Santiago of the provisions of Federal Rule of Civil Procedure 56, notified him that the granting of a motion to dismiss or a motion for summary judgment would represent a final adjudication of this case which may foreclose subsequent litigation on the matter, and gave him an opportunity to respond to the Motion. See Orders (Docs. 5, 20); Summary Judgment Notice (Doc. 55). Santiago opposes Defendants' Motion (Response; Doc. 78), with exhibits.[2] Defendants filed a Reply (Reply; Doc. 79). As such, Defendants' Motion is ripe for review.

## II. Santiago's Allegations

In the Amended Complaint, Santiago asserts all Defendants used excessive force against him in violation of the Eighth Amendment. See Amended Complaint at 5. The events that form the basis of his claims occurred at Union Correctional Institution (UCI) on December 7, 2021. Id. at 10. The sequence of events is a bit unclear, but Santiago describes what sounds like a reactionary use of force due to his noncompliance or disruption. See id. at 7–9. Santiago alleges Defendants Levai and Burns sprayed him with chemical

---

[2] For all pleadings and documents filed in this case, the Court cites to the document and page numbers as assigned by the Court's Electronic Case Filing System.

2

agents three times, only the first of which was justified.[3] He asserts that, after Defendant Burns administered the first application of chemical agents, "[he] was refused the chance to comply and submit to hand restraints." Id. at 8. He contends he was willing to comply with Defendant Levai's orders to submit to a strip search and restraints, but Defendant Levai lied "on camera," saying that he was refusing to take off his socks. Id. at 7.

After the third application of chemical agents, a cell extraction team, which included Defendants Jackson and Dean, arrived. Id. Santiago asserts that Defendant Levai ordered him to submit to a strip search, which he did, but then Defendant Levai had Defendant Jackson conduct "another strip search on [him]." Id. Santiago says that he "followed all orders given to him [but Defendant] Jackson . . . lied stating on camera that [he] would not strip …. as a tactic to force the extraction team in[to] [his] cell." Id. at 7–8. He claims to have done "everything ordered" of him, including taking off his socks and explains that he tried to bring his feet into view of the handheld camera as proof that he was complying. Id.

Finally, Santiago asserts that, after the cell extraction team entered his cell, Defendant Jackson punched him in the mouth and slammed his face into

---

[3] Santiago implies he was engaged in conduct that justified the first application of chemical agents but does not specify what that conduct was. See Amended Complaint at 7–8.

the ground, and Defendant Dean punched him in the ribs and legs. Id. at 8–9.

He claims the incident resulted in two chipped/fractured teeth. Id. at 10.

## III. Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure (Rule(s)), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).[4] An

---

[4] Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions." Rule 56 advisory committee's note 2010 Amends.

> The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id. "[A]lthough the interpretations in the advisory committee['s] notes are not binding, they are highly persuasive." Campbell v. Shinseki, 546 F. App'x 874, 879 n.3 (11th Cir. 2013). Thus, case law construing the former Rule 56 standard of review remains viable.

issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that

---

In citing to Campbell, the Court notes that it does not rely on unpublished opinions as binding precedent; however, they may be cited in this Order when the Court finds them persuasive on a particular point. See McNamara v. GEICO, 30 F.4th 1055, 1060–61 (11th Cir. 2022); see generally Fed. R. App. P. 32.1; 11th Cir. R. 36–2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

there is a genuine issue for trial." <u>Jeffery v. Sarasota White Sox, Inc.</u>, 64 F.3d 590, 593–94 (11th Cir. 1995) (internal citations and quotation marks omitted).

Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." <u>Anderson</u>, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." <u>Haves v. City of Miami</u>, 52 F.3d 918, 921 (11th Cir. 1995) (citing <u>Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro</u>, 38 F.3d 1571, 1578 (11th Cir. 1994)). "Summary judgment is improper, however, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Guevara v. NCL (Bahamas) Ltd.</u>, 920 F.3d 710, 720 (11th Cir. 2019) (quotation marks and citation omitted).

## IV. Summary of the Arguments

### A. Defendants' Arguments & Evidence

In their Motion for Summary Judgment, Defendants contend they are entitled to summary judgment on the grounds that their use of force was reasonable under the circumstances, and their conduct did not cause Santiago's claimed injuries. <u>See</u> Motion at 2; Reply at 5–6. Arguing that Santiago cannot establish a constitutional violation, they invoke the doctrine

of qualified immunity. See Motion at 2. Additionally, Defendants invoke Eleventh Amendment immunity and argue that, to the extent Santiago's Eighth Amendment claims proceed, he cannot recover compensatory or punitive damages under the Prison Litigation Reform Act. Id.

In support of the Motion, Defendants rely on the following exhibits to demonstrate that their uses of force were not excessive: video footage from a handheld camera (Def. Ex. A1–3 (filed under seal));[5] an incident report (Def. Ex. D; Doc. 52-3); and disciplinary reports (Def. Exs. E, F; Docs. 52-4, 52-5).[6] These exhibits shed light on the circumstances surrounding the use of force on Santiago on December 7, 2021. According to disciplinary report log # 213-211425, Santiago broke the sprinkler head in his cell, causing it and nearby cells to flood. See Def. Ex. E at 2.[7] In an incident report, Defendant Levai explained as follows:

> Inmate Santiago had utilized an unknown object to break his sprinkler head. Additionally, Inmate Santiago had his state issue linen, mattress fold, personal property and state issue [c]lothing on the cell

---

[5] The video footage is on three DVDs, which the Court will cite as "Def. Ex. A1," for the first DVD; "Def. Ex. A2," for the second; and "Def. Ex. A3," for the third.

[6] Defendants provide other exhibits, but those are relevant solely to the issues of injuries and causation (Def. Exs. B, C; Docs. 60-1, 52-2). For reasons discussed later, the Court can adjudicate the Motion on the issue of liability. As such, the Court need not summarize the evidence related to Santiago's injuries or causation.

[7] A second disciplinary report, log # 213-211423, reflects that Santiago disobeyed an order by refusing to relinquish his hand restraints. See Def. Ex. F at 2.

> floor. Inmate Santiago refused all verbal orders to get
> his cell into compliance.

<u>See</u> Def. Ex. D at 2 (capitalization omitted). Santiago was placed on 72-hour

property restriction "due to the misuse of his personal [p]roperty." <u>Id.</u> at 2, 4.

The video evidence depicts what happened after Santiago broke the

sprinkler head. As the officer in charge, Defendant Levai gave the lead-in

statement, explaining that Santiago was "creating a disturbance by breaking

the sprinkler head and yelling out of [his] cell . . . [and he a]lso refus[ed] to

submit to hand restraint procedures to be placed on property restriction." <u>See</u>

Def. Ex. A1. Defendant Levai reported that he had "counseled with Inmate

Santiago about his behavior and ordered him to cease his actions to no avail."

<u>Id.</u> Defendant Levai further stated, "I have contacted Duty Warden Norman,

advised him of the actions of Santiago, who is a psych-grade 1, and chemical

agents have been authorized. Non-involved security CIT-trained staff,

Lieutenant [Defendant] Burns, has attempted to counsel Inmate Santiago to

no avail." <u>Id.</u>

Following the lead-in statement, the video evidence chronicles the

sequence of events. Defendant Levai, followed by the camera operator, enters

Santiago's dorm at about 22:44. <u>Id.</u> Water is visible on the floor outside his and

nearby cells. <u>Id.</u> Defendant Levai approaches Santiago's cell door and gives

him a "final order" to submit to hand restraint procedures to be placed on

8

property restriction. Id. Santiago asks why he is being placed on property restriction. Id. Defendant Levai walks out of view of the camera, but the camera operator remains. Id. Santiago can be seen and heard communicating with other inmates about being placed on property restriction. Id. With solid doors on the cells, the inmates speak loudly to communicate. See id.

When Defendant Levai returns about four minutes later, he again asks Santiago if he is ready to submit to hand restraints. Id. Santiago refuses. Id. Defendant Levai advises that chemical agents will be administered to gain Santiago's compliance. Id. Defendant Burns administers a first round of chemical agents at about 22:53. Id. Immediately thereafter, Defendant Levai reports to the camera, "[Santiago] used his property to cover up and block the effects of the chemical agents." Id. Defendant Levai walks out of the view of the camera, but the camera operator remains. Id. Santiago can be seen covering his mouth and nose with an article of clothing or bedding. Id. He eventually starts banging on his cell door in a rhythmic way and asks other inmates to join him in chanting along, which they do. Id. What they are saying is unclear, but it becomes quite loud inside the dorm. Id.

After about ten minutes, Defendant Levai returns and asks Santiago for a third time if he will submit to "restraint procedures." Id. Santiago's response is indecipherable, but it appears he agrees to comply because Defendant Levai

orders Santiago to "strip out." <u>Id.</u> Santiago partially complies as evidenced by the fact that he is no longer wearing a shirt. <u>Id.</u> However, Defendant Levai tells him repeatedly to remove all of his clothing, including those on the parts of his body not visible through the cell window (boxers and socks). <u>Id.</u> Defendant Levai tells Santiago twice to remove his boxers and five times to remove his socks or whatever he has on his feet. <u>Id.</u> To demonstrate his compliance, Santiago lifts his left foot up to the cell window. <u>Id.</u> His left foot is bare. <u>Id.</u> He never shows his right foot. <u>Id.</u> Defendant Burns administers a second round of chemical agents at about 23:06. <u>Id.</u> Defendant Levai again walks out of the view of the camera. <u>Id.</u>

With the camera still trained on Santiago's cell, Santiago starts talking to the camera operator and holds "paperwork" up to his cell window, saying, "You see that. Lawsuits [indecipherable]. . . . I specialize in that." <u>Id.</u> (He later slides the "paperwork" through the flap in his cell door and leaves it there for some time. <u>Id.</u>) Santiago says, "Hey officer, I'm willing to comply and cuff up." <u>Id.</u> He repeats that multiple times, and tells the camera operator, "Hey officer, you need to get on your walkie talkie and call the LT [lieutenant] and let him know I'm willing to comply." <u>Id.</u> He says, "You're refusing to let me comply." <u>Id.</u> Other inmates can be heard yelling in apparent reaction to the disturbance involving Santiago. <u>Id.</u> One inmate yells to Santiago, "Do what the guy/guard

10

[inaudible] say. . . . [inaudible] . . . Take your spray like a man." <u>Id.</u> Santiago later raises both of his feet to his cell window so the camera can document that he is not wearing socks. <u>Id.</u>

When Defendant Levai returns, he again asks Santiago if he will submit to "hand restraint procedures." <u>Id.</u> Santiago replies, "Yes, sir." <u>Id.</u> Defendant Levai instructs Santiago to "strip out" for a visual strip search, telling him to step back so his entire body can be seen, including his feet. <u>Id.</u> Defendant Levai attempts to complete the full hand restraint procedures, ordering Santiago to "run [his] fingers through [his] mouth" and "turn around and squat." <u>Id.</u> It appears Santiago does not comply with the latter order (to turn around and squat) because Defendant Levai repeats the order three times. <u>Id.</u> Defendant Levai reports to the camera, "[Santiago] is refusing to submit to proper hand restraint procedures, so a third round of chemical agents will be administered." <u>Id.</u> Before Defendant Burns administers the third round of chemical agents, Santiago tells the officers, "Look at that paperwork," referring to the papers he pushed through the flap in his cell door. <u>Id.</u> Defendant Burns administers a third round of chemical agents at about 23:19. <u>Id.</u>

After the third spraying, Santiago taps on his cell window to get the camera operator's attention, and he holds something up to the window that looks like a cell phone. <u>See</u> Def. Ex. A2. Santiago holds the object up to his ear

11

as if talking on a phone. Id. Loud banging can be heard inside the dorm, and other inmates start yelling, "Let him cuff up." Id. A few minutes later, Santiago yells, "I'm trying to cuff up . . . . Let me cuff up." Id. Santiago then yells to another inmate, saying he will pay that inmate $50 to make a phone call for him. The other inmate tells Santiago it is too late to make a phone call. Id.

Santiago repeats that he is ready to comply and is not wearing socks, and he holds his feet up to the cell window again. Id. Both feet are visible and bare. Id. Other inmates can be heard yelling about the situation: one says, "Let him cuff up," and another responds, "If he don't want to cuff up, he ain't have to cuff up." Id. Santiago yells to an officer outside of the camera's view, "Hey officer, anytime I want to comply, you got to let me comply. I'm telling you, I want to cuff up." Id. The unknown officer responds to him in a calm manner, seemingly asking if he is ready to come out of his cell, although what the officer says is not clear. Id. Other inmates start yelling again. One of them says, "LT man, the man said he want to cuff up. . . . Let the man out of the fu*king room, man." Id. Other inmates continue yelling to one another while Santiago waits for Defendant Levai to return. Id.

When Defendant Levai and other officers return to the dorm, but before they walk into view of the camera, Santiago repeatedly tells them, "I'm willing to cuff up and comply." Id. At Santiago's cell door, Defendant Levai asks

Santiago if he is ready to comply, and Santiago replies, "Yes, sir." <u>Id.</u> Defendant
Levai tells him multiple times to "strip out all the way." <u>Id.</u> Defendant Levai
indicates Santiago is not complying and asks another officer to try to get
Santiago to "strip out properly." <u>Id.</u> That officer, Defendant Jackson,
approaches Santiago's cell window and orders Santiago (twice) to "bend at the
waist" for a visual strip search. <u>Id.</u> Defendant Jackson reports, "He's refusing
to bend." <u>Id.</u> Accordingly, Defendant Levai directs the cell extraction team to
enter Santiago's cell to forcibly cuff and remove him. <u>Id.</u> Before Defendant
Levai removes the chain from the door, Santiago lifts his entire body into view
of the cell window to show he is naked, including his mid-section and feet. <u>Id.</u>
No clothing is visible on his body. <u>Id.</u>

The cell extraction team enters Santiago's cell about one minute after
Santiago showed the camera he was naked. <u>Id.</u> Defendant Levai and other
officers can be heard yelling, "Inmate Santiago, stop resisting." <u>Id.</u> Santiago's
body cannot be seen because of the number of officers surrounding him, but
the camera operator has a clear view inside the cell. <u>Id.</u> Despite the noise from
other inmates and officers yelling directives ("stop resisting"), the scene is
orderly and efficient. <u>Id.</u> No officer is seen making punching-like or violent
motions. <u>Id.</u> At one point, the officer on the far right (as depicted in the video)
lifts his arm and appears to push down on something, but it does not appear to

have been a punch. About two minutes after officers enter the cell, an officer reports, "All restraints are on." Id. Officers assist Santiago to his feet and escort him out of his cell. Id. His face is not bloody or bruised. Id. His eyes are watery, and one is partially closed from the effects of the chemical agents. Id. He is wearing boxers. Id.

The officers immediately escort Santiago to a decontamination shower. Id. While officers are removing his shackles, Santiago can be heard telling the officers that they violated chapter 33 (of the Florida Administrative Code (FAC)) by spraying him even after he said he was willing to comply. Id. He tells the officers, "Look at the paperwork on my bed. I specialize in those kinds of lawsuits." Id. He also sarcastically thanks the officers for spraying him after he said he wanted to comply, telling them, "That's free money. I appreciate it LT." Id. Santiago repeatedly complains that the officers improperly sprayed him after he said he was willing to comply, but he never complains that any officer punched him during the cell extraction. Id. In fact, it sounds as if Santiago tells the officers they should have said he was unwilling to "bend at the waist," instead of saying he was unwilling to strip out. See id. While showering, Santiago does not complain of or appear to be in pain other than from the burning caused by the chemical agents. See Def. Ex. A3.

14

Following the decontamination shower, officers take Santiago for a post-use-of-force physical examination. Id. Per policy, the camera operator does not enter the medical room, but some of what Santiago says to Defendant Levai, who is in the room with him, can be heard. He tells Defendant Levai, "Once an inmate says he wants to comply, chapter 33, you got to let him comply. You can't have me sittin' there in that spray for like five minutes after I say I want to comply." Id. He also repeats that he "specializ[es]" in lawsuits. Id. The nurse begins an examination (blood pressure and temperature check) and completes it within two minutes. Id. Santiago does not appear to ask the nurse to check his mouth or teeth. Id. He never points to his face in a way that would indicate he had an injury or issue. Id. At Defendant Levai's instruction, the camera operator scans Santiago's body with the camera after Santiago leaves the medical room. No wounds or physical injuries are observable. Id. Officers return Santiago to his decontaminated cell at 00:02 on December 8, 2021. Id. The dorm is noticeably quieter and far less chaotic at that time. See id.

## B. Plaintiff's Arguments & Evidence

In opposition to Defendants' Motion, Santiago argues Defendants used more force than necessary under the circumstances because "he was willing to comply" after the first application of chemical agents, and he "did everything ordered," including stripping completely. See Response at 2, 5. He notes that

he "even placed his body [and feet] to the door to show the handheld video recording." <u>Id.</u> As to the cell extraction, Santiago asserts the camera operator did not "have a clear view of what[] [was] happening inside [his] cell," and the fact that the officers were only in his cell for two minutes does not mean they did not use excessive force against him.[8] <u>Id.</u> at 6–7.

Santiago relies on the following exhibits: his own declaration (Pl. Ex. A; Doc. 78-1); a copy of chapter 33-602.210 of the FAC, titled, "Use of Force" (Pl. Ex. B; Doc. 78-2); UCI dental records and a sick-call request (Pl. Ex. C; Doc. 78-3); and grievance records (Pl. Ex. D; Doc. 78-4). In his declaration, Santiago concedes that he broke the sprinkler head in his cell and caused a disturbance, justifying the first use of chemical agents. <u>See</u> Pl. Ex. A ¶ 3. Nevertheless, he contends the subsequent sprayings were unjustified because he told Defendant Levai he "was willing to comply and follow[] all orders[,] . . . . [but Defendant Levai] refused to allow [him] to submit to hand restraints[, instead] stating [Santiago would not] take [his] socks off as a tactic to force the use of chemical agents." <u>Id.</u>

---

[8] In his Response, Santiago references only Defendant Jackson's alleged "excessive force," not Defendant Dean's. <u>See</u> Response at 7. He also says the cell extraction itself, not individual actions by extraction team members, resulted in him fracturing or chipping his teeth. <u>Id.</u> at 2.

As he does in his Amended Complaint, Santiago alleges that, after the
second spraying, he held his "feet to the cell window to show that [he] had no
socks on [and that Defendant] Levai was lying." <u>Id.</u> Santiago states he was
"refused the chance to comply." <u>Id.</u> With respect to Defendant Levai's orders to
"strip out" and the cell extraction, Santiago asserts the following:

> Defendant Lt. Levai . . . gave me an order to submit to
> a strip search which I did. I followed all orders. He act
> [sic] as I didn't. Then Defendant Sgt. Jackson did the
> same thing acting like I wasn't following orders as a
> tactic to force the Extraction Team in my cell. <u>I placed
> my body to the cell glass so the use of force camera can
> show I was completely naked to show they was lying
> as a tactic to force the Extractio[n] Team</u> . . . . Once
> inside my cell Defendant[] Sgt. Jackson[] punched me
> in the mouth two times and pick[ed] my head up and
> slam[med] it to the floor chipping and fracturing my
> front tooth, while Defendant Dean hit me in the ribs
> and legs.

<u>Id.</u> (emphasis added). Santiago says that when the nurse examined him, his
"injury [chipped/fractured teeth] was reported and documented." <u>Id.</u> ¶ 4. He
avers the FDC form documenting his post-use-of-force examination is missing
from his medical file. <u>Id.</u> He surmises that "[m]edical is covering up for the
staff." <u>Id.</u>

In an informal grievance Santiago authored the day of the incident,[9] he
complained that Defendant Levai refused to let him comply with orders, which

---

[9] According to the video and other evidence, the relevant events occurred very
late at night on December 7, 2021, and Santiago was returned to his cell just after

resulted in him being sprayed with chemical agents two times without justification. <u>See</u> Pl. Ex. D at 2–3. He stated that "chemical[l] agents [were] used . . . as a form of punishment," in violation of chapter 33, which Santiago summarized as providing, "[A]ny time an inmate state[s] he is willing to comply[,] the use of force should stop." <u>Id.</u> at 3. He reported that Defendants Levai and Jackson claimed he refused to "strip down," but he had done so and tried to prove it by "put[ting] [his] whole body [up to the] cell window." <u>Id.</u> He said they lied to "forc[e] the extraction team in [his] cell[,] denying [him] the chance to cuff up using excessive force on [sic] causing bodily harm." <u>Id.</u>

In his formal grievance, authored on December 19, 2021, Santiago repeated much of the same as he did in the informal grievance, but he added, "[O]nce the cell extraction team entered my cell they used excessive force on me causing bod[i]ly harm chip[p]ing my front tooth." <u>Id.</u> at 5. He did not specify how any member of the cell extraction team used "excessive force" against him, nor did he accuse anyone of punching him. <u>Id.</u> In his grievance appeal to the Office of the Secretary, authored on January 7, 2022, Santiago repeated his allegations, again without specifying how any member of the cell extraction team used "excessive force" against him. <u>See</u> <u>id.</u> at 7.

---

midnight. <u>See</u> Pl. Ex. D at 3; <u>see also</u> Def. Ex. A3. An FDC stamp reflects that Santiago's grievance was received on December 13, 2021. Pl. Ex. D at 2.

## V. Applicable Law

## A. Eighth Amendment Excessive Force

The Eighth Amendment "prohibits the unnecessary and wanton infliction of pain, or the infliction of pain totally without penological justification." <u>Ort v. White</u>, 813 F.2d 318, 321 (11th Cir. 1987). However, it is well understood that prison guards, who are charged with maintaining order and security, may use force when necessary to bring unruly inmates into compliance. <u>Whitley v. Albers</u>, 475 U.S. 312, 320–21 (1986); <u>Williams v. Burton</u>, 943 F.2d 1572, 1575 (11th Cir. 1991).

In <u>Sconiers v. Lockhart</u>, 946 F.3d 1256, 1265 (11th Cir. 2020), the Eleventh Circuit reviewed "the principles applicable to Eighth Amendment excessive-force" claims:

> The Eighth Amendment, among other things, prohibits "cruel and unusual punishments." U.S. Const. amend. VIII. As the Supreme Court has explained, "the unnecessary and wanton infliction of pain" qualifies under the Eighth Amendment as proscribed "cruel and unusual punishment." <u>Hudson v. McMillian</u>, 503 U.S. 1, 5 (1992). Nevertheless, the Supreme Court has instructed that what rises to the level of an "unnecessary and wanton infliction of pain" differs based on the type of Eighth Amendment violation alleged. <u>Id.</u>
>
> . . . "[T]he core judicial inquiry" requires [the Court] to consider "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." <u>Wilkins</u>,

19

559 U.S. at 37.[10] This standard requires a prisoner to establish two elements – one subjective and one objective: the official must have both "acted with a sufficiently culpable state of mind" (the subjective element), and the conduct must have been "objectively harmful enough to establish a constitutional violation." Hudson, 503 U.S. at 8.

With respect to the subjective element, "to have a valid claim . . . the excessive force must have been sadistically and maliciously applied for the very purpose of causing harm." Johnson v. Breeden, 280 F.3d 1308, 1321 (11th Cir. 2002); see also Thomas v. Bryant, 614 F.3d 1288, 1304 (11th Cir. 2010).

As for the objective component of an excessive-force violation, it focuses on whether the official's actions were "harmful enough," Hudson, 503 U.S. at 8, or "sufficiently serious," Wilson v. Seiter, 501 U.S. 294, 298 (1991), to violate the Constitution. "Not every malevolent touch by a prison guard gives rise to a federal cause of action." Wilkins, 559 U.S. at 37. "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Id. at 37–38. Instead, the Eighth Amendment prohibits force that offends "contemporary standards of decency," regardless of whether "significant injury is evident," though the extent of injury may shed light on the amount of force applied or "whether the use of force could plausibly have been thought necessary." Wilkins, 559 U.S. at 37.

Id. at 1265–66 (internal citations cleaned up).

---

[10] Wilkins v. Gaddy, 559 U.S. 34 (2010) (per curiam).

Officers may use chemical agents to quell a disturbance so long as a valid

penological reason supports its use and it is not used in "quantities greater

than necessary or for the sole purpose of punishment or the infliction of pain."

Thomas, 614 F.3d at 1310–11 ("[I]t is well-established that the use of chemical

agents on recalcitrant prisoners is not per se unconstitutional." (quoting in part

Soto v. Dickey, 744 F.2d 1260, 1270 (7th Cir. 1984))); see also Sconiers, 946

F.3d at 1264 (acknowledging "pepper-spray" may be used to subdue an inmate

when penologically necessary); Danley v. Allen, 540 F.3d 1298, 1307 (11th Cir.

2008), overruled on other grounds as recognized in Randall v. Scott, 610 F.3d

701, 709–10 (11th Cir. 2010) ("Pepper spray is an accepted non-lethal means

of controlling unruly inmates.").

Regardless of the type of force involved, courts consider five distinct

factors when determining whether an officer applied force maliciously and

sadistically for the purpose of causing harm:

> (1) the extent of injury; (2) the need for application of
> force; (3) the relationship between that need and the
> amount of force used; (4) any efforts made to temper
> the severity of a forceful response; and (5) the extent
> of the threat to the safety of staff and inmates, as
> reasonably perceived by the responsible officials on the
> basis of facts known to them.

Campbell v. Sikes, 169 F.3d 1353, 1375 (11th Cir. 1999) (quoting Whitley, 475

U.S. at 321; Hudson, 503 U.S. at 7). Notably, a lack of serious injury, while not

dispositive, is relevant to the inquiry:

> "[T]he extent of injury suffered by an inmate is one
> factor that may suggest 'whether the use of force could
> plausibly have been thought necessary' in a particular
> situation." Ibid.[11] (quoting Whitley, supra, at 321,
> 106 S.Ct. 1078). The extent of injury may also provide
> some indication of the amount of force applied. . . . An
> inmate who complains of a "'push or shove'" that
> causes no discernible injury almost certainly fails to
> state a valid excessive force claim. Id. at 9 (quoting
> Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir.
> 1973)).[12]

> Injury and force, however, are only imperfectly
> correlated, and it is the latter that ultimately counts.
> An inmate who is gratuitously beaten by guards does
> not lose his ability to pursue an excessive force claim
> merely because he has the good fortune to escape
> without serious injury.

Wilkins, 559 U.S. at 37–38. Nevertheless, a prisoner's injuries or lack thereof

may be "evidence of the kind or degree of force that was used by [an] officer."

Charles v. Johnson, 18 F.4th 686, 700 (11th Cir. 2021) (citing Crocker v.

Beatty, 995 F.3d 1232, 1251 (11th Cir. 2021)).

---

[11] Hudson, 503 U.S. at 7.

[12] See Johnson, 481 F.2d at 1033 ("Not every push or shove, even if it may later
seem unnecessary in the peace of a judge's chambers, violates a prisoner's
constitutional rights.").

In considering the <u>Whitley</u> factors, courts must "give a 'wide range of deference to prison officials acting to preserve discipline and security,' including when considering '[d]ecisions made at the scene of a disturbance.'" <u>Cockrell v. Sparks</u>, 510 F.3d 1307, 1311 (11th Cir. 2007) (quoting <u>Bennett v. Parker</u>, 898 F.2d 1530, 1533 (11th Cir. 1990)). Moreover, corrections officials are not required to "convince every inmate that their orders are reasonable and well-thought out," and "[c]ertainly . . . are not required to do so where an inmate repeatedly fails to follow those orders." <u>Danley</u>, 540 F.3d at 1307. As such, "courts must determine whether the evidence goes beyond a mere dispute over the reasonableness of a particular use of force or the existence of arguably superior alternatives." <u>Whitley</u>, 475 U.S. at 322. A case should not go to the jury "[u]nless it appears that the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain." <u>Id.</u>

## B. Qualified Immunity

"Qualified immunity protects from civil liability government officials who perform discretionary functions if the conduct of the officials does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" <u>Nolin v. Isbell</u>, 207 F.3d 1253, 1255 (11th Cir. 2000) (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)). As a

result, the qualified immunity defense protects from suit "'all but the plainly incompetent or those who knowingly violate the law.'" Carr v. Tatangelo, 338 F.3d 1259, 1266 (11th Cir. 2003) (citation omitted). Indeed, as "'government officials are not required to err on the side of caution,' qualified immunity is appropriate in close cases where a reasonable officer could have believed that his actions were lawful." Lee v. Ferraro, 284 F.3d 1188, 1200 (11th Cir. 2002) (quoting Marsh v. Butler Cnty., Ala., 268 F.3d 1014, 1031 n.8 (11th Cir. 2001)).

To be entitled to qualified immunity, an official bears the initial burden of establishing that his conduct fell within his discretionary authority. See Webster v. Beary, 228 F. App'x 844, 848 (11th Cir. 2007). If the defendant does so, the burden shifts to the plaintiff to demonstrate that qualified immunity is not appropriate using the two-prong test established by the Supreme Court in Saucier v. Katz, 533 U.S. 194, 201 (2001). In accordance with Saucier, the Court must ask whether the facts viewed in the light most favorable to the plaintiff "show the officer's conduct violated a constitutional right." Id.; see also Hope v. Pelzer, 536 U.S. 730, 736 (2002); Beshers v. Harrison, 495 F.3d 1260, 1265 (11th Cir. 2007) (quoting Scott v. Harris, 550 U.S. 372, 377 (2007)). The court must also ask whether the right allegedly violated was clearly established at the time of the violation. Hope, 536 U.S. at 739; Saucier, 533 U.S. at 201; Scott, 550 U.S. at 377; Underwood v. City of Bessemer, 11 F.4th

1317, 1328 (11th Cir. 2021) ("[W]e ask two questions: (1) whether the facts that
a plaintiff has alleged or shown make out a violation of a constitutional right,
and (2) if so, whether the right at issue was clearly established at the time of
the defendant's alleged misconduct.") (internal quotations omitted). The Court
may consider these questions in whichever order it chooses, and qualified
immunity will protect the defendant if the answer to either question is "no."
Pearson v. Callahan, 555 U.S. 223, 232, 236 (2009); Underwood, 11 F.4th at
1328. Notably, "[b]ecause § 1983 'requires proof of an affirmative causal
connection between the official's acts or omissions and the alleged
constitutional deprivation,' each defendant is entitled to an independent
qualified-immunity analysis as it relates to his or her actions and omissions."
Alcocer v. Mills, 906 F.3d 944, 951 (11th Cir. 2018) (quoting Zatler v.
Wainwright, 802 F.2d 397, 401 (11th Cir. 1986)).

## VI. Analysis[13]

Santiago contends that Defendants violated his Eighth Amendment
right to be free from cruel and unusual punishment in the following ways:

---

[13] In determining whether a Defendant is entitled to qualified immunity, the
Court views the evidence and all reasonable inferences that can be drawn therefrom
in the light most favorable to Santiago to the extent supported by the record and then
considers "the legal issue of whether [those] 'facts', if proven, show that the defendant
violated clearly established law." Priester v. City of Riviera Beach, Fla., 208 F.3d 919,
925 n.3 (11th Cir. 2000); Scott, 550 U.S. at 381 n.8. The facts viewed in this manner
may differ from those that ultimately can be proved.

spraying him twice with chemical agents and forcing a cell extraction without justification (Defendants Burns, Levai, and Jackson); and punching him in the face and ribs/legs (Defendants Jackson and Dean, respectively). See Amended Complaint at 7–9. Santiago does not dispute that Defendants were acting within their discretionary duties at the relevant times. See Response at 8. As such, the burden shifts to Santiago to show that Defendants are not entitled to qualified immunity. See Charles, 18 F.4th at 698.

It is undisputed that Santiago engaged in conduct that justified a reactionary use of force, and Santiago concedes the first round of chemical agents was reasonable under the circumstances. See Response at 4–5. He disputes the reasonableness of the additional two rounds of chemical agents and the cell extraction, all of which were captured on video. Id. at 5.

## A. Chemical Agents

In his declaration, Santiago avers, "[A]fter the first application of chemical agents[s] . . . I was willing to comply and followed all orders." See Pl. Ex. A ¶ 3. However, the video evidence contradicts his contention. See Def. Ex. A1, A2. For instance, after the first application of chemical agents, when Defendant Levai ordered Santiago to "strip out" completely, he did not. See Def. Ex. A1. According to Defendant Levai, Santiago did not remove his boxers or socks (or whatever he had on his feet). Id. Santiago claims to have raised his

feet to the cell window to show that Defendant Levai was not truthfully reporting his conduct, see Pl. Ex. A ¶ 3, but the video evidence—which is clear and unobstructed—shows that he brought only his left foot up to the window, see Def. Ex. A1. Santiago also did not show his mid-section, where his boxers would have been. Id. As such, the Court accepts as undisputed that Santiago did not completely "strip out" when Defendant Levai ordered him to do so.

After the second application of chemical agents, Defendant Levai again attempted to gain Santiago's compliance with "proper" hand restraint procedures, but Santiago only partially complied: he "[ran] [his] fingers through [his] mouth," but he did not "turn around and squat." Id. Defendant Levai reported to the camera that Santiago was "refusing to submit to proper hand restraint procedures." Id. The video evidence does not show whether Santiago indeed ran his fingers through his mouth or refused to turn and squat. See id. However, Santiago points to no evidence disputing Defendants' representations on the video that Santiago did not comply with Defendant Levai's order to "turn around and squat." See Pl. Ex. A ¶ 3. And, in his declaration, Santiago does not even reference the directive to squat, focusing solely on the directive to strip completely. See id. As such, based on Defendant Levai's clear instructions and same-time reports to the camera of Santiago's

27

conduct, the Court accepts as undisputed that Santiago did not comply with the order to "turn around and squat."

With respect to the use of chemical agents, affording Defendants Levai and Burns "a wide range of deference" in maintaining prison security, the Whitley factors balance in their favor. First, there was a need for force because Santiago refused to comply with lawful orders, despite his statements to the camera operator that he was willing to comply and his partial compliance with Defendant Levai's orders. Second, the force used was minimal, consisting of three bursts of chemical agents each time. Third, Santiago presented a threat of harm to himself and others given that he broke the sprinkler head inside his cell, causing it to flood, and was inciting other inmates in the dorm to engage in disruptive behavior. Throughout the incident, other inmates can be heard yelling to both Santiago and officers about the incident itself. The dorm became noticeably quieter after Santiago was successfully removed from his cell. Fourth, Defendants Levai and Burns tried to temper the severity of a forceful response. Both tried to "counsel" Santiago before resorting to force, as explained during Defendant Levai's lead-in statement, and Defendants afforded Santiago multiple opportunities and plenty of time to comply. See Def. Ex. A1, A2. Defendants also permitted Santiago to take a decontamination shower after the third application of chemical agents. See Def. Ex. A3. Finally,

the use of chemical agents caused minimal, temporary injuries (skin and eye burning or irritation), which the shower appeared to have helped. See id. Applying the Whitley factors, the Court concludes that "force was applied in a good-faith effort to maintain or restore discipline, [not] maliciously and sadistically to cause harm." See Sconiers, 946 F.3d at 1265.

Santiago appears to complain about the time that elapsed between each spraying (roughly thirteen minutes each), implying the length of time he sat in his cell with chemical agents in the air constitutes cruel and unusual punishment. See Pl. Ex. A ¶ 3. Santiago offers no evidence showing that, by spraying him three times over a roughly thirty-minute period, he suffered more than the expected temporary pain or discomfort that chemical agents can cause. Indeed, based on the video evidence, Santiago appears to have been minimally affected by the chemical agents. See Def. Ex. A1, A2. Between each spraying, he communicated with other inmates and the camera operator, and after the third spraying, he no longer used a cloth to cover his mouth and nose. Id. At no time did Santiago appear to be suffering the effects of the chemical agents to such a degree that Defendants should have removed him from his cell any sooner than they did.

For the reasons stated, the Court finds Santiago does not present evidence to show that there is a genuine issue for trial with respect to the use

of chemical agents. As such, Defendants Levai and Burns are entitled to qualified immunity on the claim that they unnecessarily sprayed Santiago with chemical agents.

## B. Cell Extraction

In addition to asserting that Defendants Jackson and Dean gratuitously punched him during the cell extraction, Santiago appears to contend the cell extraction itself constituted excessive force because, according to him, he "followed all orders." See Amended Complaint at 8; Pl. Ex. A ¶ 3; Response at 5–6. Defendant Levai stated on camera that a cell extraction was warranted because Santiago did not comply with all orders related to hand restraint procedures. See Def. Ex. A2. Both Defendants Levai and Jackson ordered Santiago to bend over, and both reported that Santiago refused. Id.

In his declaration, Santiago does not dispute that he failed to comply with the directive to bend at the waist. See Pl. Ex. A ¶ 3. In fact, he never addresses this directive. See id. Although he claims that both Defendants were lying or "acting like [he was not] following orders," he disputes solely Defendants' representations that he refused to strip completely, emphasizing in his Amended Complaint, declaration, and grievances that he attempted to bring his entire body into view of the camera to prove he was in fact wearing no clothes. See Amended Complaint at 7; Pl. Ex. A ¶ 3; Pl. Ex. D at 3, 5.

Accepting that Santiago had completely "strip[ped] out" after the third application of chemical agents, as he maintains, his refusal to bend at the waist is undisputed.[14]

Upon review of the evidence and affording Defendants Levai and Jackson "a wide range of deference" in maintaining prison security, the Court concludes the <u>Whitley</u> factors balance in their favor with respect to the cell extraction: (1) there was a need for force because Santiago refused to comply with a lawful order to bend at the waist; (2) the force used was minimal—officers efficiently and calmly cuffed and shackled Santiago in about two minutes, and helped him to his feet immediately thereafter; (3) Santiago presented a threat of harm to himself and others for reasons previously stated; (4) Defendants tried to temper the severity of a forceful response as demonstrated by their efforts to "counsel" Santiago before resorting to force and by first attempting to gain Santiago's compliance through less forceful means (chemical agents); and (5) the cell extraction caused allegedly minor injuries (chipped teeth).

---

[14] At some point before the cell extraction team breached his cell, Santiago was fully naked, as evidenced on the video. However, the video evidence also shows that, when Santiago exited his cell, he was wearing boxers. <u>See</u> Def. Ex. A2. It is unclear whether he put his boxers back on after he exposed his body to the camera, but he did step out of view from the camera for a bit after he exposed his body, during which he would have had ample time to pull on his boxers. <u>See</u> <u>id.</u>

With respect to the injuries Santiago allegedly sustained, a minor injury from a cell extraction does not, by itself, indicate excessive force was used. A cell extraction necessarily involves force, the kind of which carries the inherent risk that an inmate or officer may sustain an injury. See Thomas, 614 F.3d at 1301 n.13 ("In a cell extraction, a team of five correctional officers enter an inmate's cell and forcibly restrain and remove him." (emphasis added)). A chipped tooth is "entirely consistent" with a forceful "takedown." See Charles, 18 F.4th at 700 (noting that "small scrapes, bumps, and bruises . . . are entirely consistent with a routine takedown," which the arresting officer reasonably deemed was necessary after the arrestee refused to comply with multiple orders and was engaging in behavior that caused other arrestees to become "agitated").

For the reasons stated, the Court concludes the cell extraction itself was a reasonable use of force under the circumstances, and Defendants Levai and Jackson are entitled to qualified immunity on Santiago's claim that they lied to justify the cell extraction.

Finally, to Santiago's assertion that Defendants Jackson and Dean punched him, the video evidence, the authenticity of which Santiago does not dispute (and in fact relies on himself), along with other evidence, belies his claim. Despite the chaos that can be heard inside the dorm, the video evidence

shows an organized, efficient effort by the cell extraction team to cuff Santiago as quickly as possible, within two minutes. See Def. Ex. A2. The camera operator had an unobstructed view inside the cell, and he kept the camera trained on the members of the cell extraction team at all times. Id. Although the individual movements or actions of all five officers cannot clearly be discerned, the situation appears as calm as a cell extraction can be, and no officer can be seen making unnecessarily violent or punching-like motions. See id.

Not only can no punching-like motions be seen on the video, but Santiago's physical condition and statements immediately after the cell extraction undercut his after-the-fact assertion that officers gratuitously punched him. First, even though Santiago asserts he was punched in the face so hard that his teeth chipped, he had no blood on his face when he was removed from his cell. Id. Moreover, when Santiago was showering and being evaluated by the nurse, he complained vociferously about the officers' non-compliance with chapter 33 of the FAC with respect to the use of chemical agents. He never complained that officers punched him or engaged in conduct outside of what would be expected when five officers wearing riot gear forcibly enter a cell to subdue an unruly inmate. See Def. Ex. A3. He also did not ask

33

the nurse to evaluate his mouth during the post-use-of-force examination. See
id.

Finally, in the grievance Santiago authored the day of the incident, he
did not mention having been punched. See Pl. Ex. D at 3. Instead, he
complained solely about the successive use of chemical agents even after he
said he was willing to comply. Id. He suggested that the cell extraction itself
amounted to excessive force, claiming Defendants lied about his failure to
comply with orders to "strip down." Id. And, he claimed to have sustained
"bod[i]ly harm," but he did not identify any specific injuries, nor did he say any
member of the cell extraction team punched him. See id.

While the video evidence does not permit the Court to "pinpoint with
precision" the extent of force used by each member of the cell extraction team,
given there was a legitimate security purpose for the cell extraction, Santiago
suffered minimal injuries, and the video evidence documents an organized,
seemingly non-violent cell extraction, the Court concludes "that the evidence
in this case raises only a 'mere dispute over the reasonableness of the
particular use of force' and could not support 'a reliable inference of
wantonness in the infliction of pain.'" See Brown, 813 F.2d at 1189–90 (quoting
Whitley, 475 U.S. at 322); see also Oliver v. Warden, 761 F. App'x 960, 965
(11th Cir. 2019) (holding that bending an inmate's fingers or "ramm[ing] [him]

in the back with a baton during [a] cell extraction" was not "out of proportion to the legitimate need for force," even though the officers' alleged conduct was not "obviously" contradicted by the video evidence).

On this point, the Court finds persuasive the summary judgment order issued by another jurist of this Court based on similar allegations and evidence. Gomez v. Lister, No. 3:20-cv-253-BJD-MCR, 2022 WL 562266, at *10, 14 (M.D. Fla. Feb. 23, 2022), aff'd, No. 22-10808, 2022 WL 16776248 (11th Cir. Nov. 8, 2022) (granting the defendant-officers' motion for summary judgment on an excessive force claim in which the plaintiff alleged officers punched and kicked him during a cell extraction even though "the individual movements or actions of each officer" could not be discerned on the video, where the cell extraction was justified given the plaintiff's behavior, it "appeared calm and professional," was completed within minutes, and "no kicking or punching motions [were] visible").[15] Here, as in Gomez, the video evidence "document[s] the scenario sufficiently to give an objective view of what happened." See id. at *18. The video evidence is reliable and chronicles all relevant events, capturing

---

[15] The Court notes that although decisions of other district courts are not binding, they too may be cited as persuasive authority. See Stone v. First Union Corp., 371 F.3d 1305, 1310 (11th Cir. 2004) (noting that, "[a]lthough a district court would not be bound to follow any other district court's determination, the decision would have significant persuasive effects.").

the calm demeanor of the officers involved and Santiago's own statements and physical condition after he was removed from his cell.

Upon review, the Court finds Santiago does not present evidence demonstrating a genuine issue of material fact for trial on his claim that Defendants Jackson or Dean punched him. The evidence, viewed in the light most favorable to Santiago, does not "support a reliable inference of wantonness in the infliction of pain." See Whitley, 475 U.S. at 322. If this case were to proceed to trial, Santiago would have only his own testimony that Defendants Jackson and Dean punched him for the sole purpose of inflicting pain. His unsubstantiated, after-the-fact assertion constitutes no more than a "mere scintilla of evidence" upon which no reasonable jury could find in his favor. See Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990) ("A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party.").

Focusing on "the core judicial inquiry" of "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm," and considering all the evidence, the Court concludes that Santiago does not point to evidence reasonably suggesting Defendants Jackson and Dean used force maliciously or sadistically to cause

36

him harm. See Hudson, 503 U.S. at 7. As such, they are entitled to qualified immunity.[16]

Accordingly, it is

**ORDERED:**

1.    Defendants' Motion for Summary Judgment (Doc. 52) is **GRANTED** to the extent Defendants are entitled to qualified immunity on Santiago's Eighth Amendment claims.

2. The **Clerk** shall enter judgment in favor of Defendants, terminate any pending motions, and close the case.

**DONE AND ORDERED** at Jacksonville, Florida, this 19th day of December, 2024.

**MARCIA MORALES HOWARD**
United States District Judge

Jax-6
c:    Benito A. Santiago, #M83000
      Counsel of Record

---

[16] Finding Defendants are entitled to qualified immunity on Santiago's Eighth Amendment claims, the Court will not address Defendants' remaining arguments.